UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
EFRAIN SOTO,

                                Plaintiff,

                                                        **REPORT AND**
            -against-                                   **RECOMMENDATION**

JOSEPH IACOVINO, CHAD COOPER,                           01 Civ. 5850 (SCR) (GAY)
RICHARD GINGRAS. MARIE PRISCO,
TERRI DALY, THOMAS MATTHEWS,
DEBRA STELMACH and CLAYTON BOUTON,

                                Defendants.
---------------------------------------------------------------X


TO THE HONORABLE STEPHEN C. ROBINSON, United States District Judge:


        Plaintiff Efrain Soto brings this § 1983 action *pro se* alleging that, while he was a

prisoner in state custody, defendants were deliberately indifferent to his medical needs

and retaliated against him because he complained about prison employees' alleged

misconduct.[1]  Presently before this Court is defendants' motion for summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  For the reasons

set forth below, I respectfully recommend that defendants' motion be denied in part and

granted in part.

_____

        [1] By Memorandum Order dated June 4, 2003, Judge Martin granted defendants'
motion to dismiss in part, and dismissed all claims against Superintendent Strack and
Deputy Superintendent Mazzucca and plaintiff's claim of retaliatory denial of medical
care.  Judge Martin denied plaintiff's motion for reconsideration by Order dated July 30,
2003.  On or about May 5, 2005, Your Honor denied plaintiff's second motion for
reconsideration of Judge Martin's decision.

## I. BACKGROUND

The following facts, gleaned from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions, are construed in a light most favorable to plaintiff.

At all relevant times, plaintiff was incarcerated at Fishkill Correctional Facility.[2] During his incarceration at Fishkill, plaintiff was an Inmate Liaison Committee representative who reported alleged acts of "employee misconduct" to prison officials.

On or about February 24, 1999, defendant Cooper issued a misbehavior report against plaintiff for his alleged refusal to obey a direct order, i.e., a mandatory callout for medical clinic. Pursuant to jail policy, inmates from the main building seeking prescription medication refills assemble at 6:45 p.m. Monday through Friday at the commissary checkpoint to be escorted to the pharmacy. On the evening in question, Soto claimed he was unable to go because of an injury and told Cooper he would pick up his medication in the morning when he went to sick call for his injury. On or about March 9, 1999, In response to Cooper's misbehavior report, Hearing Officer Iacovino conducted a Tier II Hearing and found Soto guilty based upon Cooper's report (witnessed by C.O. Leisengary) and the testimony of R.N. Carter, who stated that she notified the C.O. that Soto had a mandatory callout for clinic and was to attend. Iacovino sentenced Soto to 15 days in the SHU. Soto appealed Iacovino's decision on

---

[2] Plaintiff was paroled in March, 2004.

2

the grounds that he would not allow Soto to question Carter or introduce documents showing Cooper's action was retaliatory, nor would he accept Soto's testimony that he arranged to pick up his medication the next day. Soto specifically alleged that Iacovino was biased because he knew Soto had a lawsuit pending against him. On or about March 15, 1999, Deputy Superintendent Mazzuca affirmed Iacovino's decision.

On or about March 3, 1999, plaintiff wrote a letter to Lieutenant Tucker in which Soto stated: "Just after meeting with you concerning my prior write up on CO Cooper, at exactly 7:33 p.m. CO Cooper wanted me to tell him what you and I have [sic] discussed. I told him that our discussion was a private matter. . . . CO Cooper then asked if it was about the ticket he wrote on me. I thought about not responding and just walk away, but instead I said 'no.' He then said: 'oh that's good.'"

On or about March 11, 1999, plaintiff filed a grievance against Cooper alleging that Cooper broke Soto's headphones and typewriter (as Cooper packed Soto's property in preparation for his transfer to SHU) in retaliation for Soto's prior complaints. On or about April 13, 1999, following an investigation, the Inmate Grievance Resolution Committee (IGRC) concluded that items were damaged, and recommended that the facility replace said items at no cost to Soto and that due care be exercised when transporting property.

On or about March 28, 1999, Soto filed a grievance against Cooper alleging that, when Soto received his personal property after being transferred to SHU, he noticed several personal items missing. Soto claimed Cooper disposed of said items in retaliation for Soto's prior grievance. According to the IGRC investigation report: a couple of inmates on Soto's unit observed Cooper throwing a plastic bag containing

Soto's property into the garbage; some property was retrieved; the inmates did not want to be identified for fear of retaliation. The IGRC recommended that Superintendent Strack conduct an investigation into the alleged misconduct. Strack responded that Soto could file a claim for lost/damaged property and, if he did so, an investigation would be conducted and corrective action taken, if warranted. Soto appealed to the Central Office Review Committee (CORC) on the grounds that Strack was deliberately indifferent for refusing to conduct an investigation unless Soto filed a claim. The CORC upheld Strack's response and noted that Soto's personal property claim was under investigation and that no evidence had been presented to the CORC to substantiate Soto's allegations of Cooper's malfeasance.

On or about May 11, 1999, Soto filed a grievance against defendant Bouton alleging harassment. Soto specifically alleged that Bouton (1) refused to call a Lieutenant to inquire about the cancellation of an order that Soto be transferred to the main building, (2) ordered Soto to work while he was waiting for sick call, and (3) ordered Soto to work as a porter on Bouton's unit. Strack denied Soto's grievance.

On or about May 17, 1999, Soto filed a grievance against Bouton and defendant Gilsenan, again alleging harassment. In his grievance, Soto stated he was reluctant to file a complaint against Gilsenan because her behavior might be related to her pregnancy but, "according to the prisoners who have been here for some time–she's a regular 'Bitch.'" Soto's grievance was denied; however, on May 20, 1999, he was moved to Unit M to ensure "limited contact with Officer Bouton, if there was a conflict between you and the Officer."

On or about May 25, 1999, defendant Gingras issued a misbehavior report

4

against plaintiff for violations of sections 107.20 (lying, misleading, incomplete, false statements) and 180.18 (inmates shall accept all program assignments). Gingras specifically alleged that, on the day in question, Soto reported to his regular work assignment and was directed by Officer Dayton to report to his housing unit officer for a work assignment that day. According to Gingras, Soto came back to his housing unit and told Gingras the porter pool officer had given him the day off, and questioned why he had to work for Gingras. Following a Tier II Hearing, defendant Iacovino found Soto not guilty of violating 107.20 and guilty of violating 180.18, based upon Gingras' written report and testimony from Officers Dayton and O'Brian. On June 10, 1999, Mazzuca affirmed Iacovino's decision.

Also on or about May 25, 1999, Soto wrote a letter to Superintendent Strack, in which Soto alleged the following:

> On the day that Soto was moved to M Unit, Officer Bouton spent most of the day on that unit, rather than on his assigned unit, in order to conspire with Officer Gingras to make sure Bouton's retaliatory actions against Soto would continue. That morning, Gingras "began harassing grievant about his medically prescribed pillow and mattress," during which Bouton stated "you see Soto the squeaky wheel gets the grease, what goes around comes around." Soto told them he anticipated their conspiracy of unified harassment. Bouton laughed and whispered something to Gingras. On May 25, 1999, Gingras "wrote a ticket" placing Soto on full cube restriction and stated "that's the way it goes, man, you want to write up officers, then you have to pay the price." Soto returned to his cube and wrote this letter.

Two days later, on or about May 27, 1999, Soto wrote another letter to Superintendent Strack, wherein Soto reiterated his complaints about the alleged Gingras/Bouton conspiracy and requested that he be moved to the main building.

On or about June 8, 1999, Sgt. Van Tassel (who is not a defendant in the instant action) issued a misbehavior report against plaintiff alleging that his May 17 grievance

violated rule 107.11 (inmates shall not harass employees in writing; "harass" includes the use of abusive and obscene language). Following a Tier II Hearing–during which Soto stated that his use of the word "Bitch" was a quotation–Iacovino found Soto guilty based upon VanTassel's written report and testimony. Iacovino sentenced Soto to 20 days in keeplock. On June 18, 1999, Mazzuca affirmed Iacovino's decision.

Also on or about June 18, 1999, plaintiff filed a grievance in which he contended that VanTassel's misbehavior report was clearly retaliatory and without merit. Superintendent Strack denied plaintiff's grievance; on appeal, the CORC accepted Soto's grievance and expunged the disciplinary disposition from his records.

On or about June 28, 1999, plaintiff wrote a letter to Superintendent Strack in which he complained that Gingras and another officer "may have destroyed" Soto's legal documents and other personal property while packing Soto's belongings for his transfer to SHU. Soto alleged that witnesses saw Gingras take something to the lavatory and also observed him straining as if trying to break something. During an interview with Sergeant Leeman, who investigated Soto's complaint, Soto refused to divulge the names of his witnesses on the ground that he feared retaliation against them. By letter dated July 20, 1999, Captain Lowry stated that he "had no alternative but to treat [this] incident as never occurring" because Soto refused to divulge the names of his witnesses.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." FRCP 56(c). Specifically, the party seeking summary judgment has the burden of demonstrating that no genuine issue respecting any material fact exists. LaFond v. General Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the moving party meets its burden, the burden shifts to the opposing party to come forward with "specific facts showing that there is a genuine issue for trial." FRCP 56(e).

When deciding a summary judgment motion, the court must "'resolve all ambiguities and inferences . . . in the light most favorable to the party opposing the motion.'" Neratko v. Frank, 31 F. Supp. 2d 270, 278 (W.D.N.Y. 1998) (quoting Shockley v. Vermont State Colleges, 793 F.2d 478, 481 (2d Cir. 1986)). The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment must be denied, therefore, if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

Further, because Soto filed this action *pro se*, the Court must judge his submissions by a more lenient standard that accorded to "formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (The Court must read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest.").

This liberal standard, however, "is not without limits, and all normal rules of pleading are not absolutely suspended." Stinson v. Sheriff's Dep't of Sullivan County, 499 F. Supp. 259, 262 (S.D.N.Y. 1980). In other words, Soto's *pro se* status does not relieve him of the usual requirements of summary judgment. See Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citation omitted) (a "pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment"); Kadosh v. TRW, Inc., No. 91 Civ. 5080 (PKL), 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("The work product of pro se litigants should be generously and liberally construed, but [the pro se's] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual.").

## III. CONSPIRACY

Plaintiff alleges that Bouton and Gingras conspired to issue false misbehavior reports against him; additionally, plaintiff's complaint may be broadly construed to assert that Cooper, Bouton, Gingras and Iacovino conspired to deprive Soto of his constitutional rights.

In order to prevail on a claim for conspiracy under 42 U.S.C. § 1983, plaintiff must show that defendants "acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated [his] rights, privileges, or immunities secured by the Constitution or federal courts." Shabazz v. Pico, 994 F. Supp. 460, 467 (S.D.N.Y. 1998) (quotations and citations omitted). In other words, plaintiff must demonstrate "an agreement among two or more persons . . . [with] substantial facts giving rise to an inference of a meeting of the minds of the alleged

8

conspirators." <u>Rodriguez v. Selsky</u>, No. 02 Civ. 2580, 2003 WL 23018812, at *5 (S.D.N.Y. Dec. 22, 2003) (quotation and citation omitted). Mere conclusory, vague or general allegations of conspiracy must be dismissed. <u>See</u> <u>Boddie v. Schneider</u>, 105 F.3d 857, 860 (2d Cir. 1997). "Specifically, plaintiff must provide some factual basis supporting a 'meeting of the minds,' such as that defendants 'entered into an agreement, express or tacit, to achieve the unlawful end.'" <u>Romer v. Morgenthau</u>, 119 F. Supp.2d 346, 363 (S.D.N.Y. 2000) (quoting <u>Warren v. Fischl</u>, 33 F. Supp.2d 171, 177 (E.D.N.Y. 1999)). Here, apart from plaintiff's assertion that prison officials conspired against him, there is no evidence in the extensive record to support the necessary reasonable inference of a "meeting of the minds." Accordingly, I respectfully recommend that plaintiff's conspiracy claim must be dismissed.

## IV. EQUAL PROTECTION

Plaintiff states, in his submissions in conjunction with the instant motion, that people of color were more often sent to SHU by Iacovino, and given harsher sentences, than white people. Construing plaintiff's assertions broadly, the Court concludes that plaintiff is alleging an equal protection claim against Lieutenant Iacovino on the ground that he subjected inmates of color to harsher punishment for violations of prison regulations than similarly situated white inmates. Plaintiff, however, adduces no evidence in support of said claim; there is no evidence in the record from which a reasonable fact-finder could infer that Iacovino discriminated against inmates of color. Accordingly, I respectfully recommend that plaintiff's equal protection claim must be dismissed.

## V. PROCEDURAL DUE PROCESS

Plaintiff claims that defendant Iacovino was biased when he found plaintiff guilty after disciplinary hearings concerning Gingras' May 25th misbehavior report and VanTassel's June 8th misbehavior report.  The Supreme Court has held that inmates must be afforded certain procedural safeguards during prison disciplinary hearings, including written notice of the charges, a written statement by the hearing officer supporting his decision and the opportunity, where appropriate, to appear at the hearing and present witnesses and documentary evidence.  See Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974).  Additionally, the hearing disposition must be supported by at least "some evidence."  See Superintendent v. Hill, 472 U.S. 445, 455 (1985).  Further, the Fourteenth Amendment's due process clause requires that the hearing officer who presides over a prison disciplinary hearing must be impartial.  See Francis v. Coughlin, 891 F.2d 43, 46-47 (2d Cir. 1989).

Here, plaintiff presents no evidence from which a jury could conclude that Iacovino violated his procedural due process rights in connection with the disciplinary proceedings following the May 25th and June 8th misbehavior reports.  A review of the record indicates that plaintiff received the minimal due process protections at both disciplinary hearings.  Moreover, contrary to plaintiff's assertions, Iacovino issued written statements setting forth the evidence relied upon in support of his decisions; the record indeed contains some evidence from which Iacovino's determinations can be supported.  Further, aside from plaintiff's conclusory assertions, there is no indication in the record whatsoever that Iacovino was biased against him.  Accordingly, I respectfully recommend that plaintiff's procedural due process claim must be dismissed.

**VI.  RETALIATION**

In order to prevail on his retaliation claim, plaintiff must demonstrate " (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) (internal quotations omitted).[3] As to the third prong, plaintiff must prove that the alleged adverse conduct was substantially motivated by the protected activity. See Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002). To this end, "[e]vidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff." Walker v. Keyser, No. 98 Civ. 5217, 2001 WL 1160588, at *6 (S.D.N.Y. Oct. 2, 2001) (citing Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995)). Further, the Second Circuit has noted that because inmate retaliation claims are prone to abuse, courts should examine such claims "with skepticism and particular care." See Colon, 58 F.3d at 872 (recognizing "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

A. Lieutenant Iacovino

_____

[3] Defendants do not dispute that plaintiff's speech was protected. As to the second prong, prison officials' conduct constitutes an "adverse action" when it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001). Here, construing the facts in a light most favorable to plaintiff, a question of fact exists as to whether a person similarly situated would have had their First Amendment rights deterred by the defendants' alleged conduct. At issue here, then, is whether plaintiff can prove the requisite causal connection.

Plaintiff claims that defendant Iacovino's findings after disciplinary hearings concerning Gingras' May 25th misbehavior report and VanTassel's June 8th misbehavior report were retaliatory. Plaintiff also contends that Iacovino transferred him in retaliation for his exercise of First Amendment rights. Plaintiff, however, presents no evidence from which a jury could conclude that Iacovino retaliated against him. Plaintiff alleges that Iacovino remarked, in sum and substance, that if plaintiff would "stop writing up my officers, you won't have to see my face." Given the ease with which retaliation claims may be fabricated, Iacovino's alleged statement (which he denies), standing alone, cannot suffice to create a question of fact sufficient to withstand summary judgment. As to plaintiff's claim of retaliatory transfer, there is no indication in the record that Iacovino requested, processed or in any way facilitated plaintiff's transfer. In fact, plaintiff testified at his deposition that Strack and Mazzuca (who are no longer defendants here) were "the ones who initiated and transferred me out of the facility." See Declaration of Lisa E. Fleischmann, Exh. B (January 30, 2004 deposition), at 50-51. Accordingly, I respectfully recommend that plaintiff's retaliation claim against defendant Iacovino must be dismissed.

B. Officer Gingras

Plaintiff alleges that Officer Gingras issued the May 25th misbehavior report and destroyed plaintiff's legal documents and other personal property in retaliation for plaintiff's prior grievances against Gingras' co-worker, Officer Bouton.[4] Plaintiff has

---

[4] Plaintiff specifically alleges that Gingras broke his typewriter after it had been repaired following the alleged incident with Cooper.

proffered evidence to support an inference as to Gingras' improper motive.  On May 20, 1999, plaintiff was moved to Unit M to ensure "limited contact with Officer Bouton." Plaintiff asserts that, on that same day, Officer Bouton spent most of the day on Unit M rather than on his assigned unit, providing Bouton with an opportunity to discuss plaintiff's grievances against him with Gingras.  Further, plaintiff claims that Gingras "wrote the [May 25th] ticket" and then stated "that's the way it goes, man, you want to write up officers, then you have to pay the price."  These allegations, combined with the temporal proximity of Gingras' alleged conduct, create a genuine issue of material fact regarding the reason for Gingras' actions.  Accordingly, I respectfully recommend that defendants' motion for summary judgment on the retaliation claim must be denied as to Officer Gingras.

C. Officer Cooper

Plaintiff claims that Officer Cooper issued the February 24th misbehavior report, broke his typewriter and headphones and threw away some of his other personal property, in retaliation for plaintiff's prior grievances against him.

As to plaintiff's first allegation (that the misbehavior report was retaliatory), plaintiff fails to establish the requisite causal connection.  Plaintiff alleges that sometime after August 1998, after he was moved to Unit 21, some inmates there filed a complaint with prison officials concerning the "misconduct" of certain unnamed officers–one of whom plaintiff knew to be Officer Cooper.  Plaintiff states that the inmates did not name the officers for fear of retaliation.  Plaintiff further alleges that he was questioned by Lieutenant Tucker regarding the identities of the officers and, having received Tucker's "verbal guarantee" that he would not suffer retaliation, revealed Cooper's identity.

13

Plaintiff asserts that Cooper thereafter fabricated the February 24th misbehavior report in retaliation. Even assuming plaintiff's allegations to be true, they fail to establish a causal connection between plaintiff's protected activity and Cooper's action. In the first instance, there is nothing in the record which shows that Cooper knew of plaintiff's prior grievances or his conversation with Tucker. Further, it is unclear when plaintiff's conversation with Tucker occurred; hence, it is impossible to establish temporal proximity. In any event, temporal proximity alone is not enough for plaintiff's retaliation claim to withstand summary judgment. <u>See</u> <u>Colon</u>, 58 F.3d at 865. In sum, plaintiff fails to proffer facts from which a reasonable jury could infer that Cooper filed the February 24th misbehavior report in retaliation for plaintiff's prior complaints. Accordingly, I respectfully recommend that the February 24th misbehavior report may not serve as the foundation for plaintiff's retaliation claim against Officer Cooper.

On the other hand, plaintiff has proffered evidence from which a reasonable jury could conclude that Cooper broke plaintiff's typewriter and headphones, and disposed of some of his other personal property, in retaliation for his protected activity. Plaintiff alleges that, on or about March 3, 1999, immediately following a meeting plaintiff had with Tucker, Cooper asked plaintiff what he and Tucker had discussed and, specifically, whether they discussed the February 24th misbehavior report. Assuming plaintiff's allegations to be true, as this Court must, Cooper's remarks coupled with the temporal proximity of his alleged conduct create a genuine issue of material fact regarding the reason for Cooper's actions. Accordingly, I respectfully recommend that defendants' motion for summary judgment on the retaliation claim must be denied as to Officer Cooper to the extent it is founded upon Cooper's alleged destruction and disposal of

plaintiff's personal property.

## VII.  DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

In order to establish a § 1983 claim for deprivation of medical treatment in violation of the Eighth Amendment, plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs."  See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quotation and citation omitted).  Plaintiff must demonstrate "deliberate indifference" by evidence that corrections personnel intentionally denied, delayed access to or interfered with prescribed treatment.  See Estelle v. Gamble, 429 U.S. 97, 104-06 (1976).  Additionally, in order to succeed on his claim, plaintiff must satisfy an objective and subjective component.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  As to the objective component, plaintiff must demonstrate that the alleged deprivation was "sufficiently serious."  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  To be sufficiently serious, the deprivation must contemplate "a condition of urgency, one that may produce death, degeneration or extreme pain."  Hathaway, 37 F.3d at 66 (quotation and citation omitted).  As to the subjective component, plaintiff must demonstrate that defendants acted with a sufficiently culpable state of mind. Wilson, 501 U.S. at 298.  Mere negligence or inadvertent failure to provide medically necessary treatment does not rise to the level of a constitutional violation; subjective recklessness can satisfy the deliberate indifference standard where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  See Farmer v. Brennan, 511 U.S. 825, 847 (1994).  In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 429

15

U.S. at 106.

A.  Seriousness of the Deprivation

As part of his Eighth Amendment claim, plaintiff alleges that (1) Nurse Matthews refused to attach a TENS unit (a pain-relieving device) to plaintiff's back one morning and "reluctantly" attached the device the following day, and (2) Officer Gingras intentionally confiscated his "medically prescribed pillow."  Plaintiff contends that Matthews' and Gingras' actions caused him to suffer undue pain.

"It is well-established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need."  Evering v. Rielly, No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (citing and comparing cases).  Here, as to his allegations against Matthews and Gingras, plaintiff fails to satisfy the objective component of his Eighth Amendment claim.  Although plaintiff asserts that Matthews' and Gingras' actions caused him to suffer undue pain, nothing in the record suggests–nor does plaintiff allege–that his pain was extreme.  In sum, plaintiff fails to demonstrate that, as a result of Matthews' and Gingras' actions, he suffered injury severe enough to warrant Eighth Amendment protection.  Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claims against Nurse Matthews and Officer Gingras must be dismissed.[5]

B.  Denial of HIV medication

Plaintiff alleges that Nurse Daly and Nurse Stelmach withheld his "life-sustaining"

---

[5] In any event, assuming *arguendo* that plaintiff's injury was sufficiently serious, plaintiff fails to demonstrate that Matthews and Gingras acted with a sufficiently culpable state of mind.

HIV medication and that Nurse Administrator Prisco ignored his complaints regarding their refusal to provide the medication. Plaintiff first asserts that, upon his transfer to SHU, he received a seven-day supply of his HIV medication instead of a thirty-day supply as expected. In a memorandum dated September 8, 1998, in response to plaintiff's complaint about the seven-day supply, Prisco informed plaintiff that "[i}t is DOCS statewide policy to dispense all prescriptions to inmates in SHU in 7-day supplies only." See Affidavit of Marie Prisco ("Prisco Aff."), Exh. 2. Plaintiff does not refute the existence of said policy.[6] Next, plaintiff alleges that at one point during his stay in SHU he was "left without HIV medicines for eight days." Based on a review of plaintiff's Ambulatory Health Record, it appears that–at least once–plaintiff may not have received his seven-day supply of HIV medicines on time. Plaintiff, however, proffers no evidence in support of his claim that he did not receive the HIV medication on time because of defendants' deliberate indifference. In her September 8th memorandum to plaintiff, Prisco stated that plaintiff's medication would be dispensed in 7-day supplies *from the pharmacy* for as long as plaintiff's prescription remained current. In his complaint to Prisco, plaintiff stated that he returned from the yard and found the 7-day supply on his bed. Thus, it appears that the pharmacy sent plaintiff's HIV medication, in 7-day supplies each time, directly to plaintiff. There is nothing in the record to indicate that the pharmacy's procedure (or prison policy) was to send plaintiff's HIV medication to the nursing staff for distribution to plaintiff. Plaintiff fails to demonstrate, therefore, that the

---

[6] Plaintiff's exhibit 499-B, a memo from Nurse Administrator Tousignant dated October 3, 2000, is consistent with defendants' contentions. The memo states, in relevant part: "The order to issue 30 day supply (vs 7 day) is from Central Office and not a facility decision."

nursing staff knew, or should have known, that plaintiff did not receive his HIV medication on time–prior to his complaints directly to them. Further, it appears from the record that the nursing staff promptly contacted the pharmacy in response to plaintiff's complaints regarding the missing medication. In sum, plaintiff fails to establish that defendants deliberately withheld his HIV medication in disregard of his medical condition. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim based upon denial of HIV medication must be dismissed.

      C.  <u>Denial of Diflucan</u>

      Plaintiff alleges that, during his stay in SHU, the nursing staff denied him Diflucan which had been prescribed for him as treatment for painful oral ulcers. According to the medical records, in June 1999 plaintiff requested Diflucan from the nursing staff. Plaintiff's Diflucan prescription, however, had expired in April 1998. Defendants assert, and plaintiff does not refute, that the nursing staff was not authorized to write prescriptions, which had to be issued by an inmate's primary physician. Nor does plaintiff deny that SHU inmates could request to see a doctor in order to obtain a necessary prescription. According to plaintiff's medical records, at the time he requested Diflucan from the nursing staff he was scheduled to see a physician; the nursing staff told plaintiff he could obtain the Diflucan prescription at that time. Plaintiff, however, complains that his doctor's appointment was scheduled for two weeks later and that, as a result, he was forced to endure pain in the interim. Plaintiff also states that he did not ask for an earlier doctor's appointment because doing so would have been fruitless. Apart from his conclusory assertion, plaintiff proffers no evidence that he would have been denied an earlier doctor's appointment–had he requested one. In

18

sum, plaintiff fails to establish that defendants deliberately denied him Diflucan or delayed or interfered with his treatment in disregard of his medical condition. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim based upon denial of Diflucan must be dismissed.

D. <u>Interference with transfer to main building</u>

Plaintiff alleges that Nurse Administrator Prisco was "instrumental" in cancelling a medical order which directed that plaintiff be moved to the main building to allow him easier access to prison facilities. Plaintiff states that, because he was not transferred to the main building, he could only access prison facilities by traveling up and down a very long hill which caused him undue pain. On or about May 11, 1999, plaintiff wrote a letter to Prisco stating his belief that she had cancelled the order and requesting a response. <u>See</u> Prisco Aff., Exh. 3. By Memorandum dated June 30, 1999, Acting Nurse Administrator Krawiec informed plaintiff that she had investigated his complaint and that a medical provider had reviewed plaintiff's chart and "determined that there is no medical condition that keeps [plaintiff] from walking or housing at Bldg. 21." <u>See</u> Prisco Aff., Exh. 4. Further, Krawiec stated that plaintiff should have discussed his complaint at his June 23rd appointment with his medical provider and, if plaintiff had further concerns, he should follow the sick call procedure to request another appointment with his medical provider. <u>See</u> <u>id.</u> Prisco, in her affidavit, denies plaintiff's allegations and states that she had no authority to cancel a medical order and that only doctors could do so. Plaintiff offers no evidence to refute Prisco's contentions; rather, plaintiff responds that defendants have not shown that a doctor cancelled plaintiff's transfer order, and argues that it must have been Prisco who cancelled the order

because she was on the phone with Officer Bouton when Bouton informed plaintiff that his transfer order was cancelled. In sum, apart from plaintiff's conclusory allegations, there is no indication in the record that Prisco was in any way involved in the decision to cancel plaintiff's transfer order. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim against Prisco based upon cancellation of the transfer order must be dismissed.[7]

## VIII.  QUALIFIED IMMUNITY

Defendants assert that they are entitled to summary judgment on the grounds of qualified immunity. In order to determine whether defendants are entitled to qualified immunity, the Court must determine (1) whether plaintiff has established a constitutional violation, (2), if yes, whether the right in issue was clearly established at the time of the alleged violation and (3) if yes, whether it was objectively reasonable for defendants to believe that their actions did not violate plaintiff's clearly established, constitutionally protected right. See Harhay v. Town of Ellington Bd. of Ed., 323 F.3d 206, 211 (2d Cir. 2003). Where, as here, there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate. See McKelvie v. Cooper, 190 F.3d 58, 63 (2d Cir. 1999). Accordingly, I respectfully recommend that defendants' motion for summary judgment on qualified immunity grounds must be denied.

## IX.  REMAINING CONTENTIONS

---

[7] In any event, there is nothing in the record to indicate that the alleged deprivation was sufficiently serious, or that Prisco acted with a sufficiently culpable state of mind.

To the extent plaintiff asserts claims against defendants in their official capacities, said claims must fail. "[S]tate officials acting within their official capacities are not considered persons within the meaning of § 1983, and are therefore protected under the Eleventh Amendment against damage claims pursuant to § 1983." Luke v. Artuz, No. 93 Civ. 2069, 1995 WL 577806, at *6 (S.D.N.Y. Oct. 2, 1995). Accordingly, I respectfully recommend that defendants are entitled to summary judgment on plaintiff's official capacity claims.

Finally, plaintiff has requested various injunctive relief. Because plaintiff is no longer in the custody of the New York State DOCS, his request for injunctive relief is moot. See Phillips v. Ienuso, No. 93 Civ. 6027, 1995 WL 239062, at *1-*2 (S.D.N.Y. Apr. 24, 1995). Accordingly, I respectfully recommend that plaintiff's request for injunctive relieve must be deemed moot.

## X. CONCLUSION

For all of the foregoing reasons, I respectfully recommend that defendants' summary judgment motion should be **granted in part and denied in part**, and (1) that plaintiff's claims for **conspiracy, equal protection, procedural due process** and **deliberate indifference to serious medical needs** should be **dismissed**, (2) that plaintiff's **retaliation** claim against defendant **Iacovino** should be dismissed, (3) that defendants Joseph **Iacovino**, Marie **Prisco**, Terri **Daly**, Thomas **Matthews**, Debra **Stalmach** and Clayton **Bouton** are therefore entitled to summary judgment in their favor, (4) that the February 24th misbehavior report may not serve as the foundation for plaintiff's retaliation claim against Officer Cooper, (5) that plaintiff's **official capacity**

**claims** should be **dismissed**, (6) that plaintiff's request for **injunctive relief** should be deemed **moot**, (7) that genuine issues of material fact preclude summary judgment on plaintiff's retaliation claims against Gingras in all respects and Cooper to the extent it is founded upon Cooper's alleged destruction and disposal of plaintiff's personal property, and (8) that Gingras and Cooper are not entitled to summary judgment on the grounds of qualified immunity.

## XI. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(B), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days from receipt of this Report to serve and file written objections to this Report and Recommendation. If copies of this Report are served upon the parties by mail, the parties shall have thirteen (13) days from receipt of this Report to file and serve written objections. See Fed. R. Civ. P. 6(e). Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. See Small v, Secretary of H.H.S., 892 F.2d 5, 16 (2d Cir. 1989).

Requests for extensions of time to file objections must be made to the Honorable Stephen C. Robinson and not to the undersigned.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EFRAIN SOTO,

                Plaintiff,

    -against-

JOSEPH IACOVINO, CHAD COOPER,
RICHARD GINGRAS. MARIE PRISCO,
TERRI DALY, THOMAS MATTHEWS,
DEBRA STELMACH and CLAYTON BOUTON,

                Defendants.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

01 Civ. 5850 (SCR) (GAY)

TO THE HONORABLE STEPHEN C. ROBINSON, United States District Judge:

      Plaintiff Efrain Soto brings this § 1983 action *pro se* alleging that, while he was a

prisoner in state custody, defendants were deliberately indifferent to his medical needs

and retaliated against him because he complained about prison employees' alleged

misconduct.[1]  Presently before this Court is defendants' motion for summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").  For the reasons

set forth below, I respectfully recommend that defendants' motion be denied in part and

granted in part.

--------------------------------

[1] By Memorandum Order dated June 4, 2003, Judge Martin granted defendants'
motion to dismiss in part, and dismissed all claims against Superintendent Strack and
Deputy Superintendent Mazzucca and plaintiff's claim of retaliatory denial of medical
care.  Judge Martin denied plaintiff's motion for reconsideration by Order dated July 30,
2003.  On or about May 5, 2005, Your Honor denied plaintiff's second motion for
reconsideration of Judge Martin's decision.

## I. BACKGROUND

The following facts, gleaned from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions, are construed in a light most favorable to plaintiff.

At all relevant times, plaintiff was incarcerated at Fishkill Correctional Facility.[2] During his incarceration at Fishkill, plaintiff was an Inmate Liaison Committee representative who reported alleged acts of "employee misconduct" to prison officials.

On or about February 24, 1999, defendant Cooper issued a misbehavior report against plaintiff for his alleged refusal to obey a direct order, i.e., a mandatory callout for medical clinic. Pursuant to jail policy, inmates from the main building seeking prescription medication refills assemble at 6:45 p.m. Monday through Friday at the commissary checkpoint to be escorted to the pharmacy. On the evening in question, Soto claimed he was unable to go because of an injury and told Cooper he would pick up his medication in the morning when he went to sick call for his injury. On or about March 9, 1999, In response to Cooper's misbehavior report, Hearing Officer Iacovino conducted a Tier II Hearing and found Soto guilty based upon Cooper's report (witnessed by C.O. Leisengary) and the testimony of R.N. Carter, who stated that she notified the C.O. that Soto had a mandatory callout for clinic and was to attend. Iacovino sentenced Soto to 15 days in the SHU. Soto appealed Iacovino's decision on

---

[2] Plaintiff was paroled in March, 2004.

the grounds that he would not allow Soto to question Carter or introduce documents showing Cooper's action was retaliatory, nor would he accept Soto's testimony that he arranged to pick up his medication the next day. Soto specifically alleged that Iacovino was biased because he knew Soto had a lawsuit pending against him. On or about March 15, 1999, Deputy Superintendent Mazzuca affirmed Iacovino's decision.

On or about March 3, 1999, plaintiff wrote a letter to Lieutenant Tucker in which Soto stated: "Just after meeting with you concerning my prior write up on CO Cooper, at exactly 7:33 p.m. CO Cooper wanted me to tell him what you and I have [sic] discussed. I told him that our discussion was a private matter. . . . CO Cooper then asked if it was about the ticket he wrote on me. I thought about not responding and just walk away, but instead I said 'no.' He then said: 'oh that's good.'"

On or about March 11, 1999, plaintiff filed a grievance against Cooper alleging that Cooper broke Soto's headphones and typewriter (as Cooper packed Soto's property in preparation for his transfer to SHU) in retaliation for Soto's prior complaints. On or about April 13, 1999, following an investigation, the Inmate Grievance Resolution Committee (IGRC) concluded that items were damaged, and recommended that the facility replace said items at no cost to Soto and that due care be exercised when transporting property.

On or about March 28, 1999, Soto filed a grievance against Cooper alleging that, when Soto received his personal property after being transferred to SHU, he noticed several personal items missing. Soto claimed Cooper disposed of said items in retaliation for Soto's prior grievance. According to the IGRC investigation report: a couple of inmates on Soto's unit observed Cooper throwing a plastic bag containing

3

Soto's property into the garbage; some property was retrieved; the inmates did not want to be identified for fear of retaliation. The IGRC recommended that Superintendent Strack conduct an investigation into the alleged misconduct. Strack responded that Soto could file a claim for lost/damaged property and, if he did so, an investigation would be conducted and corrective action taken, if warranted. Soto appealed to the Central Office Review Committee (CORC) on the grounds that Strack was deliberately indifferent for refusing to conduct an investigation unless Soto filed a claim. The CORC upheld Strack's response and noted that Soto's personal property claim was under investigation and that no evidence had been presented to the CORC to substantiate Soto's allegations of Cooper's malfeasance.

On or about May 11, 1999, Soto filed a grievance against defendant Bouton alleging harassment. Soto specifically alleged that Bouton (1) refused to call a Lieutenant to inquire about the cancellation of an order that Soto be transferred to the main building, (2) ordered Soto to work while he was waiting for sick call, and (3) ordered Soto to work as a porter on Bouton's unit. Strack denied Soto's grievance.

On or about May 17, 1999, Soto filed a grievance against Bouton and defendant Gilsenan, again alleging harassment. In his grievance, Soto stated he was reluctant to file a complaint against Gilsenan because her behavior might be related to her pregnancy but, "according to the prisoners who have been here for some time–she's a regular 'Bitch.'" Soto's grievance was denied; however, on May 20, 1999, he was moved to Unit M to ensure "limited contact with Officer Bouton, if there was a conflict between you and the Officer."

On or about May 25, 1999, defendant Gingras issued a misbehavior report

4

against plaintiff for violations of sections 107.20 (lying, misleading, incomplete, false statements) and 180.18 (inmates shall accept all program assignments). Gingras specifically alleged that, on the day in question, Soto reported to his regular work assignment and was directed by Officer Dayton to report to his housing unit officer for a work assignment that day. According to Gingras, Soto came back to his housing unit and told Gingras the porter pool officer had given him the day off, and questioned why he had to work for Gingras. Following a Tier II Hearing, defendant Iacovino found Soto not guilty of violating 107.20 and guilty of violating 180.18, based upon Gingras' written report and testimony from Officers Dayton and O'Brian. On June 10, 1999, Mazzuca affirmed Iacovino's decision.

Also on or about May 25, 1999, Soto wrote a letter to Superintendent Strack, in which Soto alleged the following:

> On the day that Soto was moved to M Unit, Officer Bouton spent most of the day on that unit, rather than on his assigned unit, in order to conspire with Officer Gingras to make sure Bouton's retaliatory actions against Soto would continue. That morning, Gingras "began harassing grievant about his medically prescribed pillow and mattress," during which Bouton stated "you see Soto the squeaky wheel gets the grease, what goes around comes around." Soto told them he anticipated their conspiracy of unified harassment. Bouton laughed and whispered something to Gingras. On May 25, 1999, Gingras "wrote a ticket" placing Soto on full cube restriction and stated "that's the way it goes, man, you want to write up officers, then you have to pay the price." Soto returned to his cube and wrote this letter.

Two days later, on or about May 27, 1999, Soto wrote another letter to Superintendent Strack, wherein Soto reiterated his complaints about the alleged Gingras/Bouton conspiracy and requested that he be moved to the main building.

On or about June 8, 1999, Sgt. Van Tassel (who is not a defendant in the instant

action) issued a misbehavior report against plaintiff alleging that his May 17 grievance violated rule 107.11 (inmates shall not harass employees in writing; "harass" includes the use of abusive and obscene language). Following a Tier II Hearing–during which Soto stated that his use of the word "Bitch" was a quotation–Iacovino found Soto guilty based upon VanTassel's written report and testimony. Iacovino sentenced Soto to 20 days in keeplock. On June 18, 1999, Mazzuca affirmed Iacovino's decision.

Also on or about June 18, 1999, plaintiff filed a grievance in which he contended that VanTassel's misbehavior report was clearly retaliatory and without merit. Superintendent Strack denied plaintiff's grievance; on appeal, the CORC accepted Soto's grievance and expunged the disciplinary disposition from his records.

On or about June 28, 1999, plaintiff wrote a letter to Superintendent Strack in which he complained that Gingras and another officer "may have destroyed" Soto's legal documents and other personal property while packing Soto's belongings for his transfer to SHU. Soto alleged that witnesses saw Gingras take something to the lavatory and also observed him straining as if trying to break something. During an interview with Sergeant Leeman, who investigated Soto's complaint, Soto refused to divulge the names of his witnesses on the ground that he feared retaliation against them. By letter dated July 20, 1999, Captain Lowry stated that he "had no alternative but to treat [this] incident as never occurring" because Soto refused to divulge the names of his witnesses.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

6

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). Specifically, the party seeking summary judgment has the burden of demonstrating that no genuine issue respecting any material fact exists. LaFond v. General Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the moving party meets its burden, the burden shifts to the opposing party to come forward with "specific facts showing that there is a genuine issue for trial." FRCP 56(e).

When deciding a summary judgment motion, the court must "'resolve all ambiguities and inferences . . . in the light most favorable to the party opposing the motion.'" Neratko v. Frank, 31 F. Supp. 2d 270, 278 (W.D.N.Y. 1998) (quoting Shockley v. Vermont State Colleges, 793 F.2d 478, 481 (2d Cir. 1986)). The question is whether, in light of the evidence, a rational jury could find in favor of the nonmoving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). Summary judgment must be denied, therefore, if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

Further, because Soto filed this action *pro se*, the Court must judge his submissions by a more lenient standard that accorded to "formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994) (The Court must read a pro se party's "supporting papers

liberally, and . . . interpret them to raise the strongest arguments that they suggest.").
This liberal standard, however, "is not without limits, and all normal rules of pleading are
not absolutely suspended." <u>Stinson v. Sheriff's Dep't of Sullivan County</u>, 499 F. Supp.
259, 262 (S.D.N.Y. 1980). In other words, Soto's *pro se* status does not relieve him of
the usual requirements of summary judgment. <u>See Lee v. Coughlin</u>, 902 F. Supp. 424,
429 (S.D.N.Y. 1995) (citation omitted) (a "pro se party's 'bald assertion,' completely
unsupported by evidence, is not sufficient to overcome a motion for summary
judgment"); <u>Kadosh v. TRW, Inc.</u>, No. 91 Civ. 5080 (PKL), 1994 WL 681763, at *5
(S.D.N.Y. Dec. 5, 1994) ("The work product of pro se litigants should be generously and
liberally construed, but [the pro se's] failure to allege either specific facts or particular
laws that have been violated renders his attempt to oppose defendants' motion
ineffectual.").

## III. CONSPIRACY

Plaintiff alleges that Bouton and Gingras conspired to issue false misbehavior
reports against him; additionally, plaintiff's complaint may be broadly construed to
assert that Cooper, Bouton, Gingras and Iacovino conspired to deprive Soto of his
constitutional rights.

In order to prevail on a claim for conspiracy under 42 U.S.C. § 1983, plaintiff
must show that defendants "acted in a willful manner, culminating in an agreement,
understanding or 'meeting of the minds,' that violated [his] rights, privileges, or
immunities secured by the Constitution or federal courts." <u>Shabazz v. Pico</u>, 994 F.
Supp. 460, 467 (S.D.N.Y. 1998) (quotations and citations omitted). In other words,
plaintiff must demonstrate "an agreement among two or more persons . . . [with]

substantial facts giving rise to an inference of a meeting of the minds of the alleged conspirators." Rodriguez v. Selsky, No. 02 Civ. 2580, 2003 WL 23018812, at *5 (S.D.N.Y. Dec. 22, 2003) (quotation and citation omitted). Mere conclusory, vague or general allegations of conspiracy must be dismissed. See Boddie v. Schneider, 105 F.3d 857, 860 (2d Cir. 1997). "Specifically, plaintiff must provide some factual basis supporting a 'meeting of the minds,' such as that defendants 'entered into an agreement, express or tacit, to achieve the unlawful end.'" Romer v. Morgenthau, 119 F. Supp.2d 346, 363 (S.D.N.Y. 2000) (quoting Warren v. Fischl, 33 F. Supp.2d 171, 177 (E.D.N.Y. 1999)). Here, apart from plaintiff's assertion that prison officials conspired against him, there is no evidence in the extensive record to support the necessary reasonable inference of a "meeting of the minds." Accordingly, I respectfully recommend that plaintiff's conspiracy claim must be dismissed.

## IV. EQUAL PROTECTION

Plaintiff states, in his submissions in conjunction with the instant motion, that people of color were more often sent to SHU by Iacovino, and given harsher sentences, than white people. Construing plaintiff's assertions broadly, the Court concludes that plaintiff is alleging an equal protection claim against Lieutenant Iacovino on the ground that he subjected inmates of color to harsher punishment for violations of prison regulations than similarly situated white inmates. Plaintiff, however, adduces no evidence in support of said claim; there is no evidence in the record from which a reasonable fact-finder could infer that Iacovino discriminated against inmates of color. Accordingly, I respectfully recommend that plaintiff's equal protection claim must be dismissed.

9

## V. PROCEDURAL DUE PROCESS

Plaintiff claims that defendant Iacovino was biased when he found plaintiff guilty after disciplinary hearings concerning Gingras' May 25th misbehavior report and VanTassel's June 8th misbehavior report. The Supreme Court has held that inmates must be afforded certain procedural safeguards during prison disciplinary hearings, including written notice of the charges, a written statement by the hearing officer supporting his decision and the opportunity, where appropriate, to appear at the hearing and present witnesses and documentary evidence. See Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974). Additionally, the hearing disposition must be supported by at least "some evidence." See Superintendent v. Hill, 472 U.S. 445, 455 (1985). Further, the Fourteenth Amendment's due process clause requires that the hearing officer who presides over a prison disciplinary hearing must be impartial. See Francis v. Coughlin, 891 F.2d 43, 46-47 (2d Cir. 1989).

Here, plaintiff presents no evidence from which a jury could conclude that Iacovino violated his procedural due process rights in connection with the disciplinary proceedings following the May 25th and June 8th misbehavior reports. A review of the record indicates that plaintiff received the minimal due process protections at both disciplinary hearings. Moreover, contrary to plaintiff's assertions, Iacovino issued written statements setting forth the evidence relied upon in support of his decisions; the record indeed contains some evidence from which Iacovino's determinations can be supported. Further, aside from plaintiff's conclusory assertions, there is no indication in the record whatsoever that Iacovino was biased against him. Accordingly, I respectfully recommend that plaintiff's procedural due process claim must be dismissed.

## VI. RETALIATION

In order to prevail on his retaliation claim, plaintiff must demonstrate " (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) (internal quotations omitted).[3] As to the third prong, plaintiff must prove that the alleged adverse conduct was substantially motivated by the protected activity. See Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002). To this end, "[e]vidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff." Walker v. Keyser, No. 98 Civ. 5217, 2001 WL 1160588, at *6 (S.D.N.Y. Oct. 2, 2001) (citing Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995)). Further, the Second Circuit has noted that because inmate retaliation claims are prone to abuse, courts should examine such claims "with skepticism and particular care." See Colon, 58 F.3d at 872 (recognizing "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

---

[3] Defendants do not dispute that plaintiff's speech was protected. As to the second prong, prison officials' conduct constitutes an "adverse action" when it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001). Here, construing the facts in a light most favorable to plaintiff, a question of fact exists as to whether a person similarly situated would have had their First Amendment rights deterred by the defendants' alleged conduct. At issue here, then, is whether plaintiff can prove the requisite causal connection.

A. Lieutenant Iacovino

Plaintiff claims that defendant Iacovino's findings after disciplinary hearings concerning Gingras' May 25th misbehavior report and VanTassel's June 8th misbehavior report were retaliatory. Plaintiff also contends that Iacovino transferred him in retaliation for his exercise of First Amendment rights. Plaintiff, however, presents no evidence from which a jury could conclude that Iacovino retaliated against him. Plaintiff alleges that Iacovino remarked, in sum and substance, that if plaintiff would "stop writing up my officers, you won't have to see my face." Given the ease with which retaliation claims may be fabricated, Iacovino's alleged statement (which he denies), standing alone, cannot suffice to create a question of fact sufficient to withstand summary judgment. As to plaintiff's claim of retaliatory transfer, there is no indication in the record that Iacovino requested, processed or in any way facilitated plaintiff's transfer. In fact, plaintiff testified at his deposition that Strack and Mazzuca (who are no longer defendants here) were "the ones who initiated and transferred me out of the facility." See Declaration of Lisa E. Fleischmann, Exh. B (January 30, 2004 deposition), at 50-51. Accordingly, I respectfully recommend that plaintiff's retaliation claim against defendant Iacovino must be dismissed.

B. Officer Gingras

Plaintiff alleges that Officer Gingras issued the May 25th misbehavior report and destroyed plaintiff's legal documents and other personal property in retaliation for plaintiff's prior grievances against Gingras' co-worker, Officer Bouton.[4] Plaintiff has

---

[4] Plaintiff specifically alleges that Gingras broke his typewriter after it had been repaired following the alleged incident with Cooper.

proffered evidence to support an inference as to Gingras' improper motive. On May 20, 1999, plaintiff was moved to Unit M to ensure "limited contact with Officer Bouton." Plaintiff asserts that, on that same day, Officer Bouton spent most of the day on Unit M rather than on his assigned unit, providing Bouton with an opportunity to discuss plaintiff's grievances against him with Gingras. Further, plaintiff claims that Gingras "wrote the [May 25th] ticket" and then stated "that's the way it goes, man, you want to write up officers, then you have to pay the price." These allegations, combined with the temporal proximity of Gingras' alleged conduct, create a genuine issue of material fact regarding the reason for Gingras' actions. Accordingly, I respectfully recommend that defendants' motion for summary judgment on the retaliation claim must be denied as to Officer Gingras.

C. Officer Cooper

Plaintiff claims that Officer Cooper issued the February 24th misbehavior report, broke his typewriter and headphones and threw away some of his other personal property, in retaliation for plaintiff's prior grievances against him.

As to plaintiff's first allegation (that the misbehavior report was retaliatory), plaintiff fails to establish the requisite causal connection. Plaintiff alleges that sometime after August 1998, after he was moved to Unit 21, some inmates there filed a complaint with prison officials concerning the "misconduct" of certain unnamed officers—one of whom plaintiff knew to be Officer Cooper. Plaintiff states that the inmates did not name the officers for fear of retaliation. Plaintiff further alleges that he was questioned by

Lieutenant Tucker regarding the identities of the officers and, having received Tucker's "verbal guarantee" that he would not suffer retaliation, revealed Cooper's identity. Plaintiff asserts that Cooper thereafter fabricated the February 24th misbehavior report in retaliation. Even assuming plaintiff's allegations to be true, they fail to establish a causal connection between plaintiff's protected activity and Cooper's action. In the first instance, there is nothing in the record which shows that Cooper knew of plaintiff's prior grievances or his conversation with Tucker. Further, it is unclear when plaintiff's conversation with Tucker occurred; hence, it is impossible to establish temporal proximity. In any event, temporal proximity alone is not enough for plaintiff's retaliation claim to withstand summary judgment. See Colon, 58 F.3d at 865. In sum, plaintiff fails to proffer facts from which a reasonable jury could infer that Cooper filed the February 24th misbehavior report in retaliation for plaintiff's prior complaints. Accordingly, I respectfully recommend that the February 24th misbehavior report may not serve as the foundation for plaintiff's retaliation claim against Officer Cooper.

On the other hand, plaintiff has proffered evidence from which a reasonable jury could conclude that Cooper broke plaintiff's typewriter and headphones, and disposed of some of his other personal property, in retaliation for his protected activity. Plaintiff alleges that, on or about March 3, 1999, immediately following a meeting plaintiff had with Tucker, Cooper asked plaintiff what he and Tucker had discussed and, specifically, whether they discussed the February 24th misbehavior report. Assuming plaintiff's allegations to be true, as this Court must, Cooper's remarks coupled with the temporal proximity of his alleged conduct create a genuine issue of material fact regarding the reason for Cooper's actions. Accordingly, I respectfully recommend that defendants'

14

motion for summary judgment on the retaliation claim must be denied as to Officer Cooper to the extent it is founded upon Cooper's alleged destruction and disposal of plaintiff's personal property.

## VII. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

In order to establish a § 1983 claim for deprivation of medical treatment in violation of the Eighth Amendment, plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs." See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quotation and citation omitted). Plaintiff must demonstrate "deliberate indifference" by evidence that corrections personnel intentionally denied, delayed access to or interfered with prescribed treatment. See Estelle v. Gamble, 429 U.S. 97, 104-06 (1976). Additionally, in order to succeed on his claim, plaintiff must satisfy an objective and subjective component. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). As to the objective component, plaintiff must demonstrate that the alleged deprivation was "sufficiently serious." See Wilson v. Seiter, 501 U.S. 294, 298 (1991). To be sufficiently serious, the deprivation must contemplate "a condition of urgency, one that may produce death, degeneration or extreme pain." Hathaway, 37 F.3d at 66 (quotation and citation omitted). As to the subjective component, plaintiff must demonstrate that defendants acted with a sufficiently culpable state of mind. Wilson, 501 U.S. at 298. Mere negligence or inadvertent failure to provide medically necessary treatment does not rise to the level of a constitutional violation; subjective recklessness can satisfy the deliberate indifference standard where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." See Farmer v.

Brennan, 511 U.S. 825, 847 (1994). In other words, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

## A. Seriousness of the Deprivation

As part of his Eighth Amendment claim, plaintiff alleges that (1) Nurse Matthews refused to attach a TENS unit (a pain-relieving device) to plaintiff's back one morning and "reluctantly" attached the device the following day, and (2) Officer Gingras intentionally confiscated his "medically prescribed pillow." Plaintiff contends that Matthews' and Gingras' actions caused him to suffer undue pain.

"It is well-established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need." Evering v. Rielly, No. 98 Civ. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (citing and comparing cases). Here, as to his allegations against Matthews and Gingras, plaintiff fails to satisfy the objective component of his Eighth Amendment claim. Although plaintiff asserts that Matthews' and Gingras' actions caused him to suffer undue pain, nothing in the record suggests–nor does plaintiff allege–that his pain was extreme. In sum, plaintiff fails to demonstrate that, as a result of Matthews' and Gingras' actions, he suffered injury severe enough to warrant Eighth Amendment protection. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claims against Nurse Matthews and Officer Gingras must be dismissed.[5]

---

[5] In any event, assuming arguendo that plaintiff's injury was sufficiently serious, plaintiff fails to demonstrate that Matthews and Gingras acted with a sufficiently culpable state of mind.

B. Denial of HIV medication

Plaintiff alleges that Nurse Daly and Nurse Stelmach withheld his "life-sustaining" HIV medication and that Nurse Administrator Prisco ignored his complaints regarding their refusal to provide the medication. Plaintiff first asserts that, upon his transfer to SHU, he received a seven-day supply of his HIV medication instead of a thirty-day supply as expected. In a memorandum dated September 8, 1998, in response to plaintiff's complaint about the seven-day supply, Prisco informed plaintiff that "[i]t is DOCS statewide policy to dispense all prescriptions to inmates in SHU in 7-day supplies only." See Affidavit of Marie Prisco ("Prisco Aff."), Exh. 2. Plaintiff does not refute the existence of said policy.[6] Next, plaintiff alleges that at one point during his stay in SHU he was "left without HIV medicines for eight days." Based on a review of plaintiff's Ambulatory Health Record, it appears that–at least once–plaintiff may not have received his seven-day supply of HIV medicines on time. Plaintiff, however, proffers no evidence in support of his claim that he did not receive the HIV medication on time because of defendants' deliberate indifference. In her September 8th memorandum to plaintiff, Prisco stated that plaintiff's medication would be dispensed in 7-day supplies *from the pharmacy* for as long as plaintiff's prescription remained current. In his complaint to Prisco, plaintiff stated that he returned from the yard and found the 7-day supply on his bed. Thus, it appears that the pharmacy sent plaintiff's HIV medication, in 7-day supplies each time, directly to plaintiff. There is nothing in the

---

[6] Plaintiff's exhibit 499-B, a memo from Nurse Administrator Tousignant dated October 3, 2000, is consistent with defendants' contentions. The memo states, in relevant part: "The order to issue 30 day supply (vs 7 day) is from Central Office and not a facility decision."

17

record to indicate that the pharmacy's procedure (or prison policy) was to send plaintiff's HIV medication to the nursing staff for distribution to plaintiff. Plaintiff fails to demonstrate, therefore, that the nursing staff knew, or should have known, that plaintiff did not receive his HIV medication on time–prior to his complaints directly to them. Further, it appears from the record that the nursing staff promptly contacted the pharmacy in response to plaintiff's complaints regarding the missing medication. In sum, plaintiff fails to establish that defendants deliberately withheld his HIV medication in disregard of his medical condition. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim based upon denial of HIV medication must be dismissed.

C. Denial of Diflucan

Plaintiff alleges that, during his stay in SHU, the nursing staff denied him Diflucan which had been prescribed for him as treatment for painful oral ulcers. According to the medical records, in June 1999 plaintiff requested Diflucan from the nursing staff. Plaintiff's Diflucan prescription, however, had expired in April 1998. Defendants assert, and plaintiff does not refute, that the nursing staff was not authorized to write prescriptions, which had to be issued by an inmate's primary physician. Nor does plaintiff deny that SHU inmates could request to see a doctor in order to obtain a necessary prescription. According to plaintiff's medical records, at the time he requested Diflucan from the nursing staff he was scheduled to see a physician; the nursing staff told plaintiff he could obtain the Diflucan prescription at that time. Plaintiff, however, complains that his doctor's appointment was scheduled for two weeks later and that, as a result, he was forced to endure pain in the interim. Plaintiff

also states that he did not ask for an earlier doctor's appointment because doing so would have been fruitless. Apart from his conclusory assertion, plaintiff proffers no evidence that he would have been denied an earlier doctor's appointment–had he requested one. In sum, plaintiff fails to establish that defendants deliberately denied him Diflucan or delayed or interfered with his treatment in disregard of his medical condition. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim based upon denial of Diflucan must be dismissed.

D. Interference with transfer to main building

Plaintiff alleges that Nurse Administrator Prisco was "instrumental" in cancelling a medical order which directed that plaintiff be moved to the main building to allow him easier access to prison facilities. Plaintiff states that, because he was not transferred to the main building, he could only access prison facilities by traveling up and down a very long hill which caused him undue pain. On or about May 11, 1999, plaintiff wrote a letter to Prisco stating his belief that she had cancelled the order and requesting a response. See Prisco Aff., Exh. 3. By Memorandum dated June 30, 1999, Acting Nurse Administrator Krawiec informed plaintiff that she had investigated his complaint and that a medical provider had reviewed plaintiff's chart and "determined that there is no medical condition that keeps [plaintiff] from walking or housing at Bldg. 21." See Prisco Aff., Exh. 4. Further, Krawiec stated that plaintiff should have discussed his complaint at his June 23rd appointment with his medical provider and, if plaintiff had further concerns, he should follow the sick call procedure to request another appointment with his medical provider. See id. Prisco, in her affidavit, denies plaintiff's allegations and states that she had no authority to cancel a medical order and that only

19

doctors could do so. Plaintiff offers no evidence to refute Prisco's contentions; rather, plaintiff responds that defendants have not shown that a doctor cancelled plaintiff's transfer order, and argues that it must have been Prisco who cancelled the order because she was on the phone with Officer Bouton when Bouton informed plaintiff that his transfer order was cancelled. In sum, apart from plaintiff's conclusory allegations, there is no indication in the record that Prisco was in any way involved in the decision to cancel plaintiff's transfer order. Accordingly, I respectfully recommend that plaintiff's Eighth Amendment claim against Prisco based upon cancellation of the transfer order must be dismissed.[7]

## VIII. QUALIFIED IMMUNITY

Defendants assert that they are entitled to summary judgment on the grounds of qualified immunity. In order to determine whether defendants are entitled to qualified immunity, the Court must determine (1) whether plaintiff has established a constitutional violation, (2), if yes, whether the right in issue was clearly established at the time of the alleged violation and (3) if yes, whether it was objectively reasonable for defendants to believe that their actions did not violate plaintiff's clearly established, constitutionally protected right. See Harhay v. Town of Ellington Bd. of Ed., 323 F.3d 206, 211 (2d Cir. 2003). Where, as here, there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate. See McKelvie v. Cooper, 190 F.3d 58, 63 (2d Cir. 1999). Accordingly, I respectfully

---

[7] In any event, there is nothing in the record to indicate that the alleged deprivation was sufficiently serious, or that Prisco acted with a sufficiently culpable state of mind.

recommend that defendants' motion for summary judgment on qualified immunity grounds must be denied.

## IX. REMAINING CONTENTIONS

To the extent plaintiff asserts claims against defendants in their official capacities, said claims must fail. "[S]tate officials acting within their official capacities are not considered persons within the meaning of § 1983, and are therefore protected under the Eleventh Amendment against damage claims pursuant to § 1983." Luke v. Artuz, No. 93 Civ. 2069, 1995 WL 577806, at *6 (S.D.N.Y. Oct. 2, 1995). Accordingly, I respectfully recommend that defendants are entitled to summary judgment on plaintiff's official capacity claims.

Finally, plaintiff has requested various injunctive relief. Because plaintiff is no longer in the custody of the New York State DOCS, his request for injunctive relief is moot. See Phillips v. Ienuso, No. 93 Civ. 6027, 1995 WL 239062, at *1-*2 (S.D.N.Y. Apr. 24, 1995). Accordingly, I respectfully recommend that plaintiff's request for injunctive relieve must be deemed moot.

## X. CONCLUSION

For all of the foregoing reasons, I respectfully recommend that defendants' summary judgment motion should be **granted in part and denied in part**, and (1) that plaintiff's claims for **conspiracy, equal protection, procedural due process** and **deliberate indifference to serious medical needs** should be **dismissed**, (2) that plaintiff's **retaliation** claim against defendant **Iacovino** should be dismissed, (3) that defendants Joseph **Iacovino**, Marie **Prisco**, Terri **Daly**, Thomas **Matthews**, Debra

**Stalmach** and Clayton **Bouton** are therefore entitled to summary judgment in their favor, (4) that the February 24th misbehavior report may not serve as the foundation for plaintiff's retaliation claim against Officer Cooper, (5) that plaintiff's **official capacity claims** should be **dismissed**, (6) that plaintiff's request for **injunctive relief** should be deemed **moot**, (7) that genuine issues of material fact preclude summary judgment on plaintiff's retaliation claims against Gingras in all respects and Cooper to the extent it is founded upon Cooper's alleged destruction and disposal of plaintiff's personal property, and (8) that Gingras and Cooper are not entitled to summary judgment on the grounds of qualified immunity.

## XI. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(B), as amended, and Rule 72(b), Fed. R. Civ. P., the parties shall have ten (10) days from receipt of this Report to serve and file written objections to this Report and Recommendation. If copies of this Report are served upon the parties by mail, the parties shall have thirteen (13) days from receipt of this Report to file and serve written objections. See Fed. R. Civ. P. 6(e). Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered. See Small v. Secretary of H.H.S., 892 F.2d 5, 16 (2d Cir. 1989).